# IMPORTANT NOTICE

# "NOT TO BE PUBLISHED OPINION"

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: APRIL 23, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0514-MR

JOHN TAYLOR                                                                APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                    HONORABLE SARAH E. CLAY, JUDGE
NO. 23-CR-000856

COMMONWEALTH OF KENTUCKY                                                APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a five-day trial, a Jefferson Circuit Court jury found John Taylor guilty of three counts of first-degree sodomy, one count of first-degree rape, three counts of promoting a sexual performance by a minor, eight counts of first-degree sexual abuse, and three counts of distribution of obscene material to minors. He was sentenced to sixty years' imprisonment. John Taylor now appeals as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). He raises several claims of error, including that the trial court improperly restricted his closing argument, failed to ensure a valid waiver of his right to testify, denied motions for directed verdict based on insufficient evidence, violated double jeopardy principles, and erroneously admitted certain testimony. Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Jefferson Circuit Court.

## I. BACKGROUND

Appellant John Taylor ("Taylor"), an honorably discharged Army veteran and mechanic at the Kentucky State Fairgrounds, volunteered at Big Rock Park, part of Cherokee Park in Louisville, Kentucky. Caitlyn[1] was a single mother of three young school-age children, a son A.L. and daughters M.L. and P.L. Caitlyn regularly took her children to swim at the park. Taylor cleaned up around the park and helped children swing on the rope swing to jump into the creek. Taylor and Caitlyn began a relationship that turned romantic. Taylor helped Caitlyn find a home, a vehicle, and appliances.

When Caitlyn began a new job repossessing cars in January of 2021, she worked overnight and Taylor, who lived down the street, watched the children. P.L. disclosed to her mother the alleged sexual abuse that occurred to her but did not reveal abuse occurring to M.L. or A.L. The family moved away. M.L., the youngest, later disclosed sexual abuse of her and her siblings.

All three children testified at trial. M.L., P.L., and A.L. each described in graphic detail incidents occurring between January and June of 2021.

M.L. was eleven at the time she testified in 2024. She said she was "maybe" eight when Taylor babysat her. She testified to being naked at his house. She testified to being asked to put Taylor's penis in her mouth and that she said "yes." She also watched her brother put his mouth on Taylor's penis. M.L. testified to being asked multiple times by Taylor if he could put his mouth

---

[1] The last name has been omitted to protect the identity of the victims.

on her private area.  While she originally said no, she testified that she eventually said yes, and Taylor put his mouth "down there" in her "private part."  She testified this happened while she was sitting naked on his bed.

M.L. testified to Taylor having "grown up toys" and "vibrators" and that she had her own "pink" "long one" but there was also another "blue one" that was her sister's and a "dirty clear" silicone one that did not vibrate that was her brother's.  She testified that "the pink and blue ones vibrated" and when the pink one broke, she used the blue one.  M.L. testified Taylor would touch himself and watch her and movies that "had sex in it" while she was playing with the sex toy given to her by Taylor.  M.L. also testified to knowing and watching her brother use his toy at the same time while watching the movie with them.  She said Taylor told her not to tell her mom "because she doesn't want me to grow up."  She notably testified to seeing A.L. put Taylor's penis in his mouth.  She also related an incident when her sister did not want to use a toy and Taylor got mad, so her sister went and used the toy in the back of the room.

P.L. testified to getting massages from Taylor at her mom's house, and when she asked for a foot massage, "he told me not unless I can touch you down there" and lifted her legs and put his hand on her vagina.  When he attempted to put his fingers in the first time, she stopped him and said it hurt.  She said this happened more than once in Caitlin's living room.  The separate instances were identified by being on different couches.  P.L. discussed that while at Taylor's house, they were invited to remove their clothing, and they

3

did. She related similar use of sex toys and related the same story M.L. testified to about being yelled at when she didn't want to use a sex toy and moving away to use it, but that Taylor followed and watched her.

A.L. testified to multiple sex toys purchased for the children, watching pornography on Taylor's laptop, and being watched while they played with the toys. A.L. stated Taylor masturbated and touched M.L.'s vagina while the children sat on either side of him. A.L. testified to putting his mouth on Taylor's penis and that Taylor told M.L. and P.L. that they could taste or feel it if they wanted to. A.L. described four sex toys in detail, i.e., color, shape, etc., as having been purchased by Taylor for the children.

All three children testified that Taylor did not eat dinner naked or go to the park naked or sit in front of their mother naked despite his claim to detectives of a nudist lifestyle. The children stated Taylor told them he would go to jail and they would be taken away from their mother if anyone knew about the abuse.

After P.L. and M.L. had both disclosed the abuse to the siblings, Caitlin sought Louisville Metro Police Department's involvement. This led to forensic interviews with the Children's Advocacy Center ("CAC"), and a custodial interview in which Taylor denied wrongdoing but admitted being nude around the children per his chosen unclothed lifestyle. This lifestyle was the reason the children saw him with an erection and, despite denying wrongdoing, he did say "maybe" he would let the children touch his penis if their mom allowed it.

Taylor was indicted on numerous felony charges. He proceeded as hybrid counsel with the active participation of attorneys. The jury convicted him on all but two counts. He was later sentenced to sixty years.

Taylor raises five specific errors on appeal including: 1) the trial court improperly limited his closing argument preventing him from presenting a defense or alternatively his waiver of the right to testify was not knowing and intelligent; 2) there was insufficient evidence particularly regarding victims' ages and elements requiring a directed verdict on the sodomy and sexual abuse charges; 3) there was insufficient evidence to support convictions for all three children for promoting sexual performance; 4) double jeopardy occurred because multiple convictions for promoting a sexual performance constitute multiple punishments; and 5) admission of testimony from the CAC's interview was irrelevant and improper bolstering, resulting in palpable error.

Further facts are developed below, as needed.

## II. ANALYSIS

### A. The trial court did not deny a right to present a defense when it limited closing arguments.

Taylor first argues that the trial court violated his constitutional right to present a defense by restricting his closing argument after he elected to proceed as hybrid counsel.

There is some debate as to the preservation of this issue and its compliance with the rules. The Commonwealth pointed out Taylor's initial failure to cite to the record for preservation in this instance. If a party does not cite to any authority for an argument, we are not required to address that

5

argument. However, Taylor amended his brief to address this alleged failure by including the requisite citations to the record in the two missing footnotes and pointed out the same references discussed and quoted throughout the remainder of that original argument. In the interest of justice, we will address these as preserved. Because we will allow the alleged error to proceed as preserved, and because trial courts retain broad discretion to control the scope of closing argument to ensure counsel does not stray beyond the evidence presented at trial, we review for abuse of discretion. To amount to an abuse of discretion, the trial court's decision must be "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky. 2007) (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)).

It is well-settled that opening statements and closing arguments are not evidence. *Stopher v. Commonwealth,* 57 S.W.3d 787, 805–06 (Ky. 2001). "Great leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument.*" *Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky. 1987).

> Attorneys are allowed great latitude in their closing arguments. They may draw reasonable inferences from the evidence and propound their explanations of the evidence and why the evidence supports their respective theories of the case. However, they may not argue facts that are not in evidence or reasonably inferable from the evidence.

*Garrett v. Commonwealth,* 48 S.W.3d 6, 25-26 (Ky. 2001) (internal citations omitted).

> Even when a defendant makes a knowing, intelligent, and voluntary request to proceed pro se or with hybrid representation, the right of

6

self-representation is not absolute. *Major v. Commonwealth*, 275 S.W.3d 706, 720 (Ky. 2009) (citation omitted). "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Faretta v. California*, 422 U.S. 806, 834 (1975) (citation omitted).

*Allen v. Commonwealth*, 410 S.W.3d 125, 134 (Ky. 2013).

Here, the record demonstrates that the trial court's rulings did not prevent Taylor from arguing his theory of the case; rather, the court prohibited him from introducing new factual assertions not admitted into evidence under the guise of argument. During closing, Taylor repeatedly attempted to describe events in the first person in a manner that went beyond the admitted evidence, prompting objections that the court sustained. The court explained that closing argument is not "a time for you to testify," and instructed that argument must be limited to "what has happened at trial."

These limitations were proper. A defendant's right to present a defense does not include the right to circumvent the rules of evidence by presenting unsworn testimony during closing argument. *See Garrett*, 48 S.W.3d at 25-26 (recognizing the restriction on admitting facts not already in evidence). Nor does it permit a defendant, even when acting as hybrid counsel, to place before the jury factual assertions that have not been subjected to cross-examination. Importantly, Taylor was not prevented from commenting on the evidence, challenging the credibility of witnesses, or urging the jury to adopt his interpretation of the facts. The trial court's rulings merely required that he do so within the same evidentiary constraints applicable to any attorney. Because

7

the court's actions were reasonable and within its discretion, no error occurred.

## B. No error occurred when Taylor waived his right to testify.

Taylor next contends that his waiver of the right to testify was not knowing and voluntary because he did not understand how that decision would affect his ability to argue in closing. A defendant's right to testify is "firmly grounded in the Fifth, Sixth, and Fourteenth Amendments" and must be knowingly and voluntarily waived. *Woolfolk v. Commonwealth*, 339 S.W.3d 411, 417 (Ky. 2011). However, the trial court's obligation is to ensure that the defendant understands the right itself—not to advise the defendant of every strategic consequence that may flow from the decision to testify or not testify.

The record reflects that the trial court conducted an on-the-record colloquy in which Taylor acknowledged that he understood his right to testify and affirmatively chose not to do so, stating that he felt "no compelling need because the case is weak." The record demonstrates no indication of coercion, misunderstanding of the right itself, or interference by counsel.

Although Taylor now argues that he did not appreciate the impact of his decision on his closing argument, the Constitution does not require the trial court to anticipate and explain such strategic implications. *See Watkins v. Commonwealth*, 105 S.W.3d 449, 453 (Ky. 2003) (requiring only a knowing and voluntary waiver of the right). The trial court satisfied its duty, and no error occurred.

8

As to the alleged overlap or infringement of the previous limitation of his defense *because of* the restriction on his right to testify, we find this argument unpersuasive.

On February 19, 2024, a thorough *Faretta* hearing occurred. The trial court articulated the various ways a person is entitled to representation including representation of themselves. Hybrid counsel and "whisper" counsel were described. Specifically, the trial court articulated the advantages of an attorney and that the licensed attorney can advise

> as to the harm and consequences of what you say in court and what you have the right not to say. He also understands legal objections . . . he knows what evidence can come in at trial and what cannot come in at trial. . . . Your attorney will argue for your side during the whole process.

After explaining the advantages of counsel, the potential disadvantages of self-representation were articulated.

> **Trial Court**: In terms of the jobs you will take on, it is almost always unwise to represent yourself in court. Do you understand that you will not get special treatment from me?
> **Taylor**: I hope not.
> **Trial Court**: You must follow all the procedural and substantive rules of criminal law, the same laws your attorney went to school to learn and has been required to abide by the entire time while he has been practicing.

An extensive colloquy followed during which the trial court engaged in an illustrative conversation with Taylor. The trial court proceeded through the hearing unrushed and with candor. The trial court began simply and clearly stating, "There is a difference between a layperson and a lawyer, and you are asking to proceed as a lawyer." This eventually led to Taylor referencing

9

himself as an experienced mechanic and using his actual life experience to provide this analogy:

> It's kinda like being a mechanic. There's different levels. Some mechanics can change oil and rotate tires and do that kinda stuff and some people can change an engine, and some people can tear it down and rebuild it. I'm changing an engine. I'm not tearing it down and rebuilding.

The trial court aptly engaged with Taylor's illustrative analogy:

> **Trial Court:** If I were to tell you, Mr. Taylor, that I am going to change this engine out myself.  What would you think about that?
> **Taylor**: I would tell you that are in for a lo-o-ong process because its going to be a learning curve, but if you –
> **Trial Court**: But I wouldn't be facing life in prison if I messed up.
> **Taylor**: Yes, ma'am I understand and with that I am the only one who has anything to lose here.

He was then further questioned about the penalties and parole eligibility.

Appellant claims the circumstances of this case "mandate an inquiry by the court not merely into whether a person . . . wishes to waive their right to testify, but also to ensure that they understand how that decision will affect their ability to represent themselves as hybrid counsel in closing argument." We have said "a trial court should refrain from engaging in direct colloquy with a defendant regarding the right to testify, unless the trial court is aware that trial counsel is overriding the defendant's wish to exercise the right to testify." *Lynch v. Commonwealth,* 642 S.W.3d 647, 657 (Ky. 2022).

Referencing circumstances already in evidence—such as his interview with the detective—does not permit Taylor to supplement the record during closing argument with his own testimony about what he was thinking or his version of events.  This constitutes testifying.  By testifying, the defendant

10

becomes a witness. *French v. Commonwealth,* 277 S.W. 265, 267 (Ky. 1925) ("Where a defendant offers himself as a witness in his own behalf and testifies in chief concerning any phase of the charge against himself, he may be cross-examined by the Commonwealth upon that subject."). It is common for a defendant to provide their version of events, but the trial court must allow the Commonwealth the opportunity to challenge that version. KRE[2] 611(b) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility."). During the *Faretta* hearing, Taylor knowingly and voluntarily waived his right to testify. Taylor consulted with his co-counsel and advised the trial court he would not be testifying. The trial court advised Taylor of his right to testify and that it was his decision, not that of his co-counsel, whether he chose to or not. Taylor articulated his lack of need to testify because "the case is weak." The trial court reaffirmed that decision and moved on. A *Faretta* hearing adequately acknowledges the rules of evidence and addresses the procedure which must be followed. The trial court's inquiry into Taylor's decision was sufficient and did not need to press further given our limitations on inquiring too deeply into a defendant's decision to testify under *Lynch. Lynch,* 642 S.W.3d at 657 (noting it "unwise for the trial court to engage in a direct colloquy" concerning a defendant's right to testify and recommending the "no-inquiry" rule).

---

[2] Kentucky Rules of Evidence

11

Taylor was aware he must follow the rules. Those rules prohibit testimony to come in during closing arguments that has not been subject to cross-examination. Thus, the restriction on testifying during a pro se closing argument is appropriate. No error occurred.

**C. Directed verdict based upon the sufficiency of the evidence of A.L.'s age was properly denied.**

Taylor next argues that the Commonwealth failed to prove beyond a reasonable doubt that A.L. was under twelve years of age at the time of the offenses.

> Our standard of review for a directed verdict overturning a conviction based on the insufficiency of the evidence mirrors that set forth by the U.S. Supreme Court. This standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Potts v. Commonwealth*, 172 S.W.3d 345, 349 (Ky. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560, (1979)); *see also Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (holding "the test for a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal[]"). "Circumstantial evidence is evidence that makes the existence of a fact more likely than not. Although circumstantial evidence must do more than point the finger of suspicion, the Commonwealth need not rule out every hypothesis except guilt beyond a reasonable doubt." *Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010) (internal quotations omitted).

*Commonwealth v. Woods*, 657 S.W.3d 902, 906 (Ky. 2022). This standard does not permit the appellate court to reweigh evidence or reassess credibility. We have further articulated the denial of a directed verdict in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) as follows:

12

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true but reserving to the jury questions as to the credibility and weight to be given to such testimony.

Thus, "there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187–88 (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)). So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied.

At trial, A.L. provided testimony indicating that specific abuse occurred when he was eleven, including statements consistent with prior disclosures. A.L. referenced a "first" time and a "last" time he put his mouth on Taylor's penis. Direct testimony by A.L. described putting his mouth on Taylor's penis when he was 11 years old. A.L. testified that the abuse began when Caitlyn started doing repo work three months before A.L. turned 12. That job benchmarked when the abuse began.

Although his testimony contained inconsistencies and some uncertainty, such inconsistencies are not uncommon in cases involving child witnesses and do not render the evidence insufficient as a whole, or as a matter of law. The jury was entitled to credit the portions of A.L.'s testimony establishing that he was under twelve at the time of the offenses. The role of the reviewing court is not to determine whether it believes the evidence but whether a rational juror

13

could. *Woods*, 657 S.W.3d at 906. Because a rational juror could find a mere scintilla of evidence to support the element of age, the trial court properly denied the motion for directed verdict.

**D. Directed verdict on promoting sexual performance by a minor was properly denied.**

Taylor also argues that the evidence was insufficient to support his multiple convictions for promoting a sexual performance by a minor. Our standard of review for a directed verdict overturning a conviction based on the insufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Woods*, 657 S.W.3d at 906.

A person is guilty of promoting a sexual performance by a minor when, "knowing the character and content thereof, he produces, directs, or promotes any performance that includes sexual conduct by a minor." KRS[3] 531.320. This Court has interpreted the statute to encompass conduct that "knowingly cause[s], create[s], or bring[s] forth . . . the organization or exhibition of any prurient matter involving a minor to an audience." *Clark v. Commonwealth*, 267 S.W.3d 668, 677 (Ky. 2008).

The evidence presented at trial included testimony that Taylor provided sexual devices to the children, instructed or encouraged their use, and was present during sexual conduct involving the minors. All three children testified to somebody watching them use the sex toys provided by Taylor. This falls

---

[3] Kentucky Revised Statutes

14

directly within the scope of KRS 531.320 whether it was Taylor as the audience or each child's other siblings. From this evidence, a jury could reasonably infer that Taylor promoted or directed a sexual performance within the meaning of the statute.

While Taylor emphasizes inconsistencies in the testimony and disputes whether a "performance" occurred, these arguments go to the weight of the evidence, not its sufficiency. Under *Woods*, the question is whether any rational juror could find the elements satisfied. The evidence here meets that standard.

### E. Double jeopardy does not occur when the harm occurs to multiple children, each constituting a separate offense.

Taylor next contends that his convictions for multiple counts of promoting a sexual performance violate double jeopardy principles because he was convicted for three counts of promoting a sexual performance by a minor for a single performance. The Double Jeopardy Clause protects against multiple punishments for the same offense.

Taylor did not preserve this issue but alleges it amounted to palpable error. *See Cardine v. Commonwealth*, 283 S.W.3d 641, 652 (Ky. 2009) ("Double jeopardy violations can be addressed as palpable error because the nature of such errors is to create manifest injustice.").

> For an error to be palpable, it must be "easily perceptible, plain, obvious and readily noticeable." A palpable error "must involve prejudice more egregious than that occurring in reversible error[.]" A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis "boils down to" is whether the reviewing court believes there is a "substantial possibility" that the

15

result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006).

Double jeopardy clauses of State and Federal Constitutions protect criminal defendants from three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *Hourigan v. Commonwealth,* 962 S.W.2d 860, 862 (Ky. 1998). If multiple convictions arise out of a single course of conduct, then the defendant has been placed in double jeopardy. KRS 505.020; *Blockburger v. United States*, 284 U.S. 299 (1932); *Commonwealth v. Burge*, 947 S.W.2d 805 (Ky. 1996). The court must determine whether the act or transaction complained of constitutes a violation of two distinct statutes and, if it does, if each statute requires proof of a fact the other does not. "It is inherent in the double jeopardy prohibition that the multiple convictions must arise from the same act. When a defendant is convicted of violating one statute multiple times, we must determine the unit of prosecution intended by the legislature to ensure each conviction passes constitutional muster." *Blair v. Commonwealth,* 718 S.W.3d 687, 690 (Ky. 2025).

In determining the unit of prosecution, we must look to the statute he is charged with offending. When interpreting a statute,

> we must look first to the plain language of a statute and, if the language is clear, our inquiry ends. We hold fast to the rule of construction that the plain meaning of the statutory language is presumed to be what the legislature intended, and if the meaning is

16

plain, then the court cannot base its interpretation on any other method or source.

*Univ. of Louisville v. Rothstein,* 532 S.W.3d 644, 648 (Ky. 2017).

Again, the language of the relevant statute, KRS 531.320 Promoting a sexual performance by a minor, reads: "A person is guilty of promoting a sexual performance by a minor when, knowing the character and content thereof, he or she produces, directs, or promotes any performance which includes sexual conduct by a minor or computer-generated image of a minor." The term "promoting" is interpreted within the statute to encompass conduct that "knowingly cause[s], create[s], or bring[s] forth" and the "performance" is the "organization or exhibition of any prurient matter involving a minor to an audience." *Clark,* 267 S.W.3d at 677.

Here, the "promoting" was the purchasing and supplying of the sex toys. The "performance" was the creation of the environment in Taylor's basement as having "organized" the occurrences and the "exhibition" involved the acts which followed of encouraging the children's masturbation. The audience included Taylor, but also was met by the audience of the other siblings witnessing the events.

Here, each count corresponded to a different child. All three children testified to Taylor's provision and direction to use sex toys. Specifically, P.L. testified all three children used an orange, ring-shaped vibrator, that Taylor told them where to put it, and that he watched. Watching three different children use sex toys which he provided constitutes three acts. The harm to each victim constitutes a separate offense or unit of prosecution, and the

17

legislature has clearly authorized separate punishments in such circumstances. Accordingly, no double jeopardy violation occurred.

**F. Admission of forensic interview testimony was not improper bolstering.**

Finally, Taylor argues that the trial court erred in permitting testimony from the forensic examiner regarding interview techniques, asserting that it improperly bolstered the children's credibility.

"A trial judge's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard." *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

At trial, Kayla Byrd, the forensic examiner at the CAC, when asked what a forensic interview was, stated, "A developmentally sensitive and legally sound method of gaining factual information regarding allegations of abuse or exposure to violence. The interview is conducted by a neutral professional using practice-informed and research-based practices." Taylor notes she testified to being given minimal information prior to the interview to "remain neutral and unbiased throughout the interview" and that she was required to be "non-leading, non-suggestive, remaining neutral, and then of course, developmentally appropriate for the age of the individual." She testified that all three children made "a disclosure" without discussing the details, substance, or extent of those disclosures.

18

Taylor takes issue with the alleged relevance of the techniques and that they were used to bolster the credibility of the children. This was not objected to and is unpreserved.

> This Court reviews unpreserved claims of error on direct appeal only for palpable error. To prevail, one must show that the error resulted in "manifest injustice." RCr 10.26 provides: A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error. This Court has stated: Under this rule, an error is reversible only if a manifest injustice has resulted from the error. That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial. While this statement is not inaccurate, it fails to adequately describe the necessary degree of prejudice associated with the unpreserved question in the context of the whole case. The language "[a] substantial possibility does not exist that the result would have been different" is at best confusing, and it falls short of the required standard. A better understanding is gained from an examination of RCr 10.26 with emphasis on the concept of "manifest injustice." While the language used is clear enough, we further explain that the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.

*Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

Ms. Byrd did not testify to the substance of the children's statements but to how she conducts interviews of children in abuse cases. The testimony at issue concerned general forensic interviewing techniques and did not directly vouch for the credibility of any particular witness. Such testimony is routinely admitted to assist the jury in understanding the context of child interviews. Moreover, the statements obtained during the forensic interview were not themselves admitted into evidence. Any potential prejudice was therefore limited, and the trial court properly acted within its discretion.

19

The three children testified extensively, and the jury could properly rely upon the direct statements of the children. Even if Ms. Byrd's testimony had been error, which it was not, the removal of which would not have caused "substantial likelihood" of a different outcome. The nature of her testimony and the possibility of prejudice resulting from her testimony is nonprejudicial in light of the context of the total circumstances. The mere fact that the children's testimony was in reference to things they had told Ms. Byrd a year prior, that they were reminded of this formal conversation occurring to trigger their memories, and her subsequent testimony regarding general standards of the interviewing techniques used, did not come close to reaching the standard for palpable error. No probability of a different result was likely in light of the extensive remaining testimony on record; therefore, no manifest injustice occurred.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Timothy G. Arnold
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Ryan Douglas Mosley
Assistant Attorney General